## SAUL vs. HIS CREDITORS.

APPEAL from the court of the first district.

PORTER, J. delivered the opinion of the court. The tableau of distribution filed by the syndics of the insolvent, was opposed in the court of the first instance; and the opposition being sustained, an appeal has been taken to this court, by the syndics, by the bank of the United States, the bank of Orleans, and the bank of Louisiana.

The claims admitted by the judge *a quo*, and which are now contested here, are:—

*First.* That of the children of the insolvent, who claim as privileged creditors, for the amount inherited by them from their deceased mother.

*Second.* That of John Jacob Astor, of New York, who avers that he is a creditor of the insolvent for the sum of $64,000, and that he has a privilege on 751 shares of stock of the bank of Orleans, which were pledged to him, and now make a part of the estate surrendered.

*Third.* That of Alexander Brown and Sons, of Baltimore, who also assert a privilege on bank stock, which they state was

VOL. V. N. S. 72

Eastern Dis't
*April*, 1827

5ns569
45 773

5ns569
46 989

5ns569
49 628

5NS 569
115 610

5NS 569
119 713

Subsequent statutes do not repeal previous ones by containing different provisions. They must be contrary.

The jurisprudence of Spain make a part of the law of Louisiana.

The rules in relation to real and personal statutes, apply also to unwritten laws or customs.

Where the personal statute of the domicil is in opposition to a real statute of situation, the real statute will prevail.

Contracts are governed by the laws of the country where they are made, but they cannot be enforced to the injury of a state whose aid is required to carry them into effect.

Nor where they are in opposition to the positive laws of that state.

In the conflict of laws, where it is doubtful

EasternDis't
*April*, 1827.

SAUL
*vs*
HIS CREDI-
TORS.

which should prevail, the court that decides should prefer the law of its own country to that of the stranger

Personal statutes of the country where a contract is sought to be enforced, may sometimes controul the personal statutes of the country where the contract was made.

The law relating to acquests and gains made during marriage, is a real, not a personal statute, and governs marriages made in other countries, where the parties reside in this, as to all property acquired after their removal.

But they yield to an *express* agreement made on entering into marriage in another country.

The contract of pledge of incorporeal

pledged to them by the insolvent, for the security of a loan of $9,000, and upwards.

The different questions of law arising on these claims, have been argued with an ability worthy of their importance. Some of these questions are now presented for the first time for decision; and those which have been already before the court, and acted on, on other occasions, have been examined with so much care by the counsel, and have received such additional light from the laborious investigation bestowed on them, that they come upon our consideration with as much freshness, as if this was the only time our attention had been drawn to them.

We shall take them up in the order in which they have been already stated, and first as to the claim of the insolvent's children.

From the facts admitted by the parties, which admission makes the statement on this appeal, it appears: That Saul and his wife intermarried in the state of Virginia, on the 6th of February, 1794, their domicil being then in that state; that they remained there until the year 1804, when they removed to the now state of Louisiana; that they fixed their residence here, and continued this residence

up to the year 1819, when the wife died; that after their removal from Virginia, and while living and having their domicil in this state, a large quantity of property was acquired, which at the death of the wife remained in the possession of her husband, the insolvent.

The children claim the one-half of the property, as acquests and gains, made by their father and mother in this state. The appellants contend, that as the marriage took place in the state of Virginia, by whose laws no community of acquests and gains was permitted, the whole of the property acquired here belonged to the husband.

This statement of the matter at issue shews, that the only question presented for our decision is one of law; but it is one which grows out of the conflict of laws of different states. Our former experience had taught us, that questions of this kind are the most embarrassing and difficult of decision, that can occupy the attention of those who preside in courts of justice. The argument of this case has shewn us, that the vast mass of learning which the research of counsel has furnished, leaves the subject as much enveloped in ob-

Eastern Dis'ct
*April,* 1827

SAUL
*vs*
HIS CREDITORS.

things will not give a preference unless evidenced by an authentic act, or one *sous seing prive,* duly recorded, at a time not suspicious

And this contract *sous seing prive,* tho' made long before insolvency, cannot be recorded, at a time when the debtor would be incapable of giving a preference by any act of his.

EasternDis'et
*April*, 1827.

SAUL
*vs.*
HIS CREDI-
TORS.

scurity and doubt, as it would have appeared to our own understandings, had we been called on to decide, without the knowledge of what others had thought, and written upon it.

Until the discussion of this cause, it was generally understood by the bar and the bench in this state, that the question now agitated was well understood in our jurisprudence; and that from the period married persons from other states moved into this, the property acquired became common, and was to be equally divided between them at the dissolution of the marriage. We have not, therefore, been insensible to the argument so strongly pressed on us, that the question being already settled by the decisions of the tribunal of last resort in the state, the subject ought not to be opened again, and that the most important interests of society require, there should be a time when contested points of jurisprudence may be considered as at rest. But these considerations are not in *this* case of sufficient weight, to preclude a re-examination of the principles on which the doctrine already stated has been established. A sufficient period has not elapsed to enable it to derive much authority from the acquiescence of others

The decision of the court cannot be supposed

to have influenced parties entering into the marriage contract, or greatly to have affected any important interests in society. It applied only to married persons emigrating from other states, whose exertions or industry cannot be supposed to have been much changed, by the anticipation of the property going in one direction or the other; whose habits were formed before they came here, and no doubt remained the same after their migration, as before. We shall, therefore, proceed to the examination of the question, as if the case was now presented for the first time, and, we trust, without any bias which might be supposed to exist on our minds, from the opinions we have already expressed.

The investigation we are about to make, will be best conducted by first examining our own statutes.

The old Civil Code provided; that every marriage contracted within this state, superinduces of right partnership, or community of acquests and gains. *Civil Code*, **336.** *art.* **63.**

Our revised code repeats this provision, and adds another: that a marriage contracted out of this state between persons who after-

EasternDis'ct
*April,* 1827

SAUL
*vs.*
HIS CREDI-
TORS.

wards come to live here, is also subject to the community of acquests, with respect to such property as is acquired after their arrival. *Code,* 2370.

If the acquests and gains, in respect to which the present suit exists, had been made under the dominion of the law last cited, there would be an end to any dispute about their distribution; but the marriage of the insolvent and his wife was dissolved by the death of the latter, before that law was enacted.

It has been contended, that as the article first cited, provides for a community of acquests and gains on all marriages contracted *within* the territory, it is an evidence the legislature did not intend there should be a community on marriages made *without: inclusio unius, est exclusio alterius.*

It would be giving too much weight to the argument *contrario sensu,* to adopt this construction. If the subject were one on which there had existed no previous legislation, it would certainly be fair to contend, that as the law maker has affirmatively declared, particular cases not enumerated should produce certain effects, this affirmative included the

negative, that other cases not enumerated should not produce these effects; though even then, this reasoning, which is founded on presumption, might yield to other circumstances, by which that presumption could be repelled. But when there already exists positive legislation on the same subject matter, providing for the very case which it is presumed is excluded, the argument loses almost entirely its weight. The law must then be interpreted by a well known rule of jurisprudence, that an intention to repeal laws can never be supposed: that subsequent statutes do not abrogate former ones by containing *different* provisions on the same subject; they must be *contrary* to produce such effect. This rule, which is true in relation to all laws, is more particularly applicable to our codes, which were only intended to lay down general principles, and provide for cases of the most common occurrence. If, then, the provisions in our code cannot be considered to have repealed the former law, no argument can be drawn from them as to the intention of the legislature to do so, or their opinion on this subject. It is more than probable their thoughts were not turned to a case

Eastern Dis't
April, 1827.

SAUL
vs.
HIS CREDI-
TORS.

which is not of frequent occurrence. If they had intended to act on it, as the matter was to say the least doubtful, they certainly would not have increased these doubts by leaving their will to be inferred from an affirmative regulation on the same subject, but in relation to a different state of things. We are bound to believe they would have legislated directly on it, and have positively declared, as they have since done, what the rule should be, when people married in another country, and removed into this.

It being clear, then, that our own statutes furnish no guide for the decision of this question, recourse must be had to the former laws of the country.

The positive regulations of Spain on this subject, are contained in two laws; one of the *Fuero Real*, and the other of the *Partidas*.

That part of the law of the Partidas which directly applies to the case before the court, is in the following words:—*E dezimos, que el pleyto que ellos pusieron entre si, deve valer en la manera que se avinieron ante que casassen, o quando casaron; e non deve ser embargado por la costumbre contraria de aquella tierra do fuesen a morar. Esso*

EasternDis'ct
April, 1827.

SAUL
vs.
HIS CREDI-
TORS.

*mismo seria, maguer ellos non pusiessen pleyto entre si; ca la costumbre de aquella tierra do fizieron el casamiento, deve valer, quanto en las dotes, e en las arras, e en las ganancias que fizieron; e non la de aquel lugar do se cambiaron. P. 4, tit. 11, ley 24*

"And we say, that the agreement they had made before or at the time of their marriage, ought to have its effect in the manner they may have stipulated, and that it will not be avoided by the custom of the place to which they may have removed. And so we say it would be, if they had not entered into any agreement; for the custom of the country where they contracted the marriage, ought to have its effect as it regards the dowry, the *arras*, and the gains they may have made; and not that of the place to which they may have removed."

Some verbal criticism has been exercised on this law. It is contended by one of the parties, that it only intended to provide for the gains made before the removal of the married couple; or, at all events, that the words used ve the sense doubtful. By the other, that egulates all, whether made before or after left the country in which the marriage

took place.    The expressions used, though not free from all ambiguity, as the appellants have argued, we think ought to receive the construction for which they contend.    The law was so understood by the commentators of that day, and the preceding parts of it, compared with the clause in which the obscurity is said to exist, serve to support this interpretation.

If these provisions in the *Partidas* stood alone, they would admit of a more favourable construction in support of the ground assumed by the counsel for the syndics, than they can receive, when taken in connexion with the law of the *Fuero Real*, which is in the following words:—

*Toda cosa que el marido y muger ganaren o compraren, estando de consuno, hayanlo ambos por medio, &c.    Novissima Recop lib.* 10, *tit.* 4, *ley* 1.

"Every thing which the husband and wife may acquire while together, shall be equally divided between them."

The codes in which these laws are found, were composed under the authority of Ferdinand the Third, and his son Alphonso the wise, nearly about the same time. The *Fuero Real* was published in the year 1255. Th

*Partidas*, although completed in **1260**, was not promulgated until nearly a century afterwards. By the Spanish writers, the former is considered, with respect to the latter, what the Institutes of Justinian are to the Pandects; and it has been admitted, that they may mutually aid in the interpretation of each other.

We have then two statutes presented for construction, one of which, not in terms the most clear, directs that the custom of the country where parties contract marriage should regulate their rights, in respect to acquests and gains; and another which declares, that every thing that husband and wife may gain or purchase, shall be equally divided between them.

If the question, as to the true interpretation of these laws, now arose for the first time, we should hesitate what construction to put on them. Either taken singly, and according to the letter, goes the whole length for which each of the parties before us contends; but before examining them, to ascertain what conclusion we should come to, if left to our judgment unaided by the opinions of others, it is proper we should endeavour to learn what construction was put on them, in the country

Eastern Dis't
April, 1827

SAUL
vs.
HIS CREDI-
TORS.

where they were made.    On whatever side the weight of authority should be found to preponderate, we may certainly adopt it.— They who have had these laws for nearly five hundred years before they passed to us; must, we feel, have more knowledge of the intention and meaning of their own legislation, than we, at this remote period of time, who have come to a knowledge of them but, as it were, of yesterday, can possibly possess.

Nothing can be more satisfactorily shewn, than the opinion of the commentators on the statutes of Spain, in relation to this particular subject.    From the time Gregorio Lopez published his work on the Partidas, in the year 1555, down to Febrero, in the year 1781, the writings of no jurist of that country have been produced to us, who treats of this matter, that does not declare. that the law of the Partidas, already cited, must be limited to property acquired in the place where the marriage is contracted, and that it does not extend to acquisitions made in another country, to which the parties may have removed, where a different rule should prevail.  In the long list of writers, who have been cited in support of this

doctrine, are to be found some of the most illustrious of whom the middle ages could boast, *James of Arena, Gulielmus de Cuneo, Dynus, Raynaldus, Jean Favre, Baldus, Alciat.* and *Ancharanus, Gregorio Lopez, on the 4 Partidas, tit.* 11, *law* 24; *Matienzo Commentaria, lib.* 5, *tit.* 9, *nos.* 73 & 74; *Febrero. P* 2, *lib.* 1, *cap.* 4, § 2, *no.* 62.

Trying the question, therefore, by authority, no doubt can exist, on which side it preponderates, in the country where the statute was passed. Admitting therefore, for a moment, that the letter of the law of the Partidas was violated, by the construction given to it by the commentators; that violation acquiesced in for centuries, by lawyers, courts, and the sovereign authority of the country, makes as much a part of the law of Spain at this day, as if the statute had been modified by the power in the state, in whom the right of legislation was vested.* In looking into the laws of any country, we stop at the threshold, if we look no further than their statutes; and what we should see there, would, in most instances, only tend to mislead. In every nation that has advanced a few steps beyond the first organization of political society. and that has made any pro-

Eastern Dis'ct
April, 1827.

SAUL
vs.
HIS CREDI-
TORS.

gress in civilization, a more extensive and equally important part of the rules which govern men, is derived from what is called, in certain countries, common law, and here, jurisprudence.

This jurisprudence, or common law, in some nations, is found in the decrees of their courts; in others, it is furnished by private individuals, eminent for their learning and integrity, whose superior wisdom has enabled them to gain the proud distinction of legislating, as it were, for their country, and enforcing their legislation by the most noble of all means:—that of reason alone. After a long series of years, it is sometimes difficult to say, whether these opinions and judgments were originally the *effect* of principles, previously existing in society, or whether they were the *cause* of the doctrines, which all men at last recognize. But whether the one, or the other, when acquiesced in for ages, their force and effect cannot be distinguished from statutory law. No civilized nation has been without such a system. None, it is believed, can do without it; and every attempt to expel it, only causes it to return with increased strength on those, who are so sanguine as to think it may

EasternDis'et
*April*, 1827.

SAUL
*vs.*
HIS CREDI-
TORS.

be dispensed with. *Duponceau on Jurisdiction*, 105.

Spain, who was among the first of the European nations that reduced her laws into codes, and who carried that mode of legislation farther than any other people, early felt the necessity of a jurisprudence, which would supply the defects, and soften the asperities of her statutes. The opinions of her jurisconsults, seem to have obtained an authority with her, of which the history of no other country offers an example. So early as the fifteenth century, a law was passed, regulating the authority which belonged to the opinions of *Bartolus*, *Baldus*, *Juan Andrea*, and *Abad*. That law was, it is true, afterwards repealed by the first of *Toro*, and directions given that in case of doubt as to the true interpretation of the statutes, recourse should be had to the sovereign himself. What was the practical operation of this last statute, our researches do not enable us positively to state. It does not, however, seem to have made much change in the practice of their courts; for in the year 1713, we find an *auto accordado* in respect to the laws that should be followed in the decision of causes; in which it is stated, as a great inconvenience,

EasternDis. of
April, 1827.

SAUL
vs.
HIS CREDI-
TORS.

that the tribunals of justice *had resorted to foreign books and authors*, to the depreciation of *their own jurists*; who, with great knowledge, had explained, and interpreted their laws, ordinances, and customs. But admitting that after the promulgation of the law of Toro, the opinions of these jurists had not the weight they before received, and that in all unsettled cases recourse was had to the sovereign himself:— when we find that nearly four hundred years after, the writers on the laws of Spain refer to no decision of their king and council on this point, express no doubt about it, and quote the opinions of jurists who wrote nearly the same length of time before them, what conclusion can we come to, but *that no doubt did exist* on the subject in Spain. That the whole nation acquiesced in the opinions of those who had early interpreted their statutes, and that the tacit consent of the sovereign himself, must be presumed given to a construction, which he had the power to change, but in which it is not shown he made any alteration. *Novissima Recop. lib. 3, tit. 2 leyes 3 & 11.*

It is most clear, then, that this interpretation, which limits the law of the *Partidas*, to the gains made in the country where the marriage

was contracted, and excludes from its opera- EasternDis'ct
*April*, 18 7.

SAUL
*vs.*
HS CREDI-
TORS.

tion, property acquired after a change of residence, comes to us recommended and fortified by every sanction that can give it value in the minds of those who sit in judgment; and whose duty it is, to pronounce what the law is, not what it ought to be.

The appellants however contend, that, although such may be the construction given to the statute in Spain, that construction is not binding on the court, because this is a question of jurisprudence not peculiar to any distinct nation, but one touching the comity of nations, and embracing doctrines of international law, on which the opinions of writers not living in Spain, are entitled to equal weight with those who professedly treat of her laws.

The strength of the plaintiff's case rests mainly on this proposition, and it is proper to examine it with the attention which its importance in the cause requires.

But though of importance, it is not of any difficulty. By the comity of nations, a rule does certainly exist, that contracts made in other countries, shall be enforced according to the principles of law which govern the contract in the place where it is made. But it al-

EasternDis'ct
*April,* 1827.

SAUL
*vs.*
HIS CREDI-
TORS.

so makes a part of the rule, that these contracts should not be enforced to the injury of the state whose aid is required to carry them into effect. It is a corrollary flowing from the principle last stated, that where the positive laws of any state, prohibit particular contracts from having effect, according to the rules of the country where they are made, the former should control. Because that prohibition is supposed to be founded on some reason of utility, or policy, advantageous to the country that passes it; which utility, or policy, would be defeated, if foreign laws were permitted to have a superior effect. On the very subject matter now before us, the writers who treat of it, although disputing about almost every thing else, agree in stating that a *real statute*, that is one which regulates property within the limits of the state where it is in force, controls *personal* ones, which follow a man wherever he goes:— indeed, it has been expressly, and with great propriety, admitted in argument, that where the personal statute of the domicil is in opposition to a real statute of situation, the real statute will prevail. *Boullenois Disc. Prelim. P.* 21; *ibid. des Demis. quest.* 6, 163; *Bouhier sur la Coutume du Duche de Bour-*

*goyne, cap.* 23, 461; *Rodenburgh de Statu-*
*tor. diversit. tit.* 2, *cap.* 5,*no.* 6.

If this be true, the question whether the opinions of foreign jurists shall control those of the country where the statute is passed, is at once settled. If the right of a nation to pass the statute, which will affect a contract made in another country, be admitted, the right cannot be contested to her to say, whether she has done so or not. She surely is the best and safest expounder of her own laws. And we repeat here, what we said a few days since, on nearly the highest authority to which we could refer: "That no court on earth, that professed to be governed by principle, would, we presume, undertake to say, that the courts of Great Britain, or France, or any other nation, had misunderstood their own statutes, and therefore, erect itself into a tribunal, by which that misunderstanding was to be corrected." 10 *Wheaton,* 159.

* And if we did recur to the jurists of France and Holland for information, what would we get in place of the well established rules in Spain? Much to confuse, and little to enlighten us. We should find great learning and ingenuity exercised by some to shew, that the

Eastern Dis'et
April, 1827.

SAUL
vs
HIS CREDI-
TORS.

law which regulates the rights of property among married persons, is a *personal one*, which follows the parties wherever they go.— By others, that it is *real*, and limited to the country by which it is made. But not one of them denies the power in a nation to pass a law such as has been lately enacted by the state of Louisiana, that a married couple moving into it from another state, shall be governed by her laws as to their future acquisitions. None of them professes to comment on the laws of Spain, which her jurists say, have the same effect with our late statute.— They are not even mentioned by them. How wholly unsatisfactory, therefore, any general reasoning must be, on different customs and usages, to prove that the law of the *Fuero* is a *personal*, and not a *real* statute, we need not say.

With this view of the subject, we might conclude. But as it is always satisfactory for this court to feel, that the authority which governs it, is founded in truth, we shall proceed to examine the grounds on which the opinions of the Spanish jurists have been so strongly assailed. In doing so, we are led into an examination of the doctrine, of real and personal statutes, as it

Eastern Dis'ct
*April*, 1827.

SAUL
*vs.*
HIL CREDI-
TORS.

is called by the continental writers of Europe; a subject, the most intricate and perplexed of any that has occupied the attention of lawyers and courts: one on which scarcely any two writers are found to entirely agree, and on which, it is rare to find one consistent with himself throughout. We know of no matter in jurisprudence so unsettled, or none that should more teach men distrust for their own opinions, and charity for those of others.

Holland and France, appear to be the countries where the greatest number of these questions have arisen, and where the subject has excited most attention. The doctrine which they denominate that of real and personal statutes, is not, as it might, from the terms used, be supposed, confined to written and positive law; but is applied, also, to unwritten laws or customs, by which the state or condition of man is regulated—his contracts governed, or his property distributed at his death. It professes to furnish the rules which are to govern men in civil matters, when they pass from one country to another, and to distinguish and decide in all cases, where the law of domicil and that of origin differ; where the rules of the place of contract and its execution conflict; where the

EasternDis't
*April,* 827.

SAUL
*vs.*
HIS CREDI-
TORS.

countries in which a marriage is contracted, and dissolved, have different regulations; or where, on the decease of the owner, his property is situated in several places, having different rules as to its distribution.

According to the jurists of those countries, a personal statute is that which follows, and governs the party subject to it, wherever he goes.

The real statute controls things, and does not extend beyond the limits of the country from which it derives its authority.

The personal statute of one country, controls the personal statute of another country, into which a party once governed by the former, or who may contract under it, should remove.

But it is subject to a real statute of the place, where the person subject to the personal should fix himself, or where the property on which the contest arises may be situated.

So far the rules are plain and intelligible, but the moment we attempt to discover from these writers, what statutes are real, and what are personal, the most extraordinary confusion is presented. Their definitions often differ, and when they agree on their definitions, they dispute as to their application.

*Bartolus,* who was one of the first by whom

EasternDis'ct
*April,* 1827.

SAUL
*vs.*
HIS CREDI-
TORS.

this subject was examined, and the most distinguished jurist of his day, established as a rule, that whenever the statute, commenced by treating of persons, it was a personal one; but if it began by disposing of things, it was real. So that if a law, as the counsel for the appellants has stated, was written thus: "the estate of the deceased shall be inherited by the eldest son," the statute was real; but if it said, "the eldest son shall inherit the estate," it was personal.

This distinction, though purely verbal, and most unsatisfactory, was followed for a long time, and sanctioned by many whose names are illustrious in the annals of jurisprudence, but it was ultimately discarded by all. D'Argentre, who rejected this rule, to real and personal statutes added a third, which he called mixed. The real statute, according to this writer, is that which treats of immoveables. *In quo de rebus soli, id est immobilus agitur,* and the personal that which concerns the person abstracted from things. *Statutum personale est illud quod afficit personam universaliter, abstracte ab omni materia reali.* The mixed he states to be one which concerns both persons and things.

Eastern Dis'ct
*April*, 1827.

SAUL
*vs.*
HIS CREDI-
TORS.

This definition of D'Argentre of a personal statute has been adopted by every writer who has treated of this matter. A long list of them, amounting to twenty five, is given by Froland in his *memoires concernans la qualite des statuts* among which are found *Burgundus, Rodenburgh, Stockmans, Voet and Dumoulin. Froland, Memoires concernans la qualite de statuts, chap. 5, no. 1.*

But the definition which he has given of a real statute, does not seem to have been so generally adopted: it was however followed by *Burgundus, Rodenburgh and Stockmans.*

Boullenois, who is one of the latest writers, attacks the definitions given by D'Argentre, and as he supposes, refutes them; he adds others which appear to be as little satisfactory, as those he rejects. He divides personal statutes, into personal particular, and personal universal; personal particular, he sub-divides again, into pure personal, and personal real. *Boullenois, Traite de la personalite et de la realite des lois, tit.* 1, *cap.* 2, *obs.* 4

Voet has two definitions, one that a real statute is that which affects principally things, though it also relates to persons, and the other, that a personal statute is that which affects principally persons, although it treats also of things.

EasternDis'ct
*April*, 1827.

SAUL
*vs.*
HIS CREDI-
TORS.

It would be a painful and a useless task, to follow these authors through all their refinements. President Bouhier, who wrote about the same time as Boullenois, and who has treated the subject as extensively as any other writer, after quoting the definitions just given, and others, says, that they are all defective, and that he cannot venture on any, until the world are more agreed what statutes are real, and what are personal. While they remain so uncertain, he thinks the best way is to follow the second definition of Voet, which is: "that a real statute is that which does not extend beyond the territory within which it is passed, and a personal, is that which does." *Bouhier sur les Coutumes de Bourgogne, chap. 23, no.* 59.

This last mode of distinguishing statutes, which teaches us what effect a statute should have, by directing us to inquire what effect it has, is quite as unsatisfactory as the rule given by Bartolus, who judged of it by the words with which it commenced.

The rules given by Chancellor D'Agusseau, are perhaps preferable to any other. That, says he, "which truly characterises a real statute, and essentially distinguishes it from a

EasternDis'ct
April, 1827.

SAUL
vs
HIS CREDI-
TORS.

personal one, is not that it should be relative to certain personal circumstances, or certain personal events; otherwise we should be obliged to say, that the statutes which relate to the *paternal power, the right of wardship, the tenancy by courtesy,* (droit de viduite,) *the prohibition of married persons to confer advantages on each other,* are personal statutes, and yet it is clear, in our jurisprudence, that they are considered as real statutes, the execution of which is regulated, not by the place of domicil, but by that where the property is situated."

"The true principle in this matter is, to examine if the statute has property directly for its object, *or its destination to certain persons, or its preservation in families,* so that it is not the interest of the person whose rights or acts are examined, but the interest of others to whom it is intended to assure the property, or the real rights which were the cause of the law. Or if, on the contrary, *all the attention* of the law is directed towards the person, to provide in general for his qualifications, or his general and absolute capacity; as when it relates to the qualities of major, or minor, of father or of son, legitimate or illegitimate,

ability or inability to contract, by reason of

personal causes."

"In the first hypothesis the statute is real, in the second it is personal, as is well explained in these words of D'Argentre: "*Cum statutum non simpliciter inhabilitat, sed ratione fundi aut juris realis alterum respicientis extra personas contrahentes, totas hanc inhabilitatem non egredi unsoj statuti.*" *Œuvres D'Agusseau*, vol. 4, 669, *cinquante-quatrieme plaidoyer.*

This definition is, we think, better than any of the rest: though even in the application of it to some cases, difficulty would exist. If the subject had been susceptible of clear and positive rules, we may safely believe this illustrious man would not have left it in doubt, for if any thing be more remarkable in him than his genius and his knowledge, it is the extraordinary fulness and clearness with which he expresses himself on all questions of jurisprudence. When he, therefore, and so many other men, of great talents and learning, are thus found to fail in fixing certain principles, we are forced to conclude that they have failed, not from want of ability, but because the matter was not susceptible of being settled on certain

EasternDis'et
April, 1827.

SAUL
vs.
HSS CREDI-
TORS.

principles.   They have attempted to go too far. To define and fix that, which cannot in the nature of things be defined and fixed.   They seem to have forgotten, that they wrote on a question which touched the comity of nations, and that, that comity is, and ever must be uncertain.   That it must necessarily depend on a variety of circumstances, which cannot be reduced within any certain rule.   That no nation will suffer the laws of another to interfere with her own, to the injury of her citizens: that whether they do or not, must depend on the condition of the country in which the foreign law is sought to be inforced—the particular nature of her legislation—her policy—and the character of her institutions.   That in the conflict of laws, it must be often a matter of doubt which should prevail, and that whenever that doubt does exist, the court which decides, will prefer the law of its own country, to that of the stranger.

These principles may be in part illustrated by one or two examples, that we presume will receive general assent.

The writers on this subject, with scarcely any exception, agree, that the laws or statutes which regulate minority and majority, and

those which fix the state and condition of man, are personal statutes, and follow and govern him, in every country.

EasternDis'ct
April, 1827.

SAUL
vs.
HIS CREDI-
TORS.

Now supposing the case of our law fixing the age of majority at twenty-five, and the country in which a man was born and lived, previous to his coming here, placing it at twenty one, no objection could be perhaps made to the rule just stated, and it may be, and we believe, would be true, that a contract made here at any time between the two periods already mentioned, would bind him.

But reverse the facts of this case, and suppose, as is the truth, that our law placed the age of majority at twenty-one; that twenty-five was the period at which a man ceased to be a minor in the country where he resided; and that at the age of twenty-four he came into this state, and entered into contracts;—would it be permitted that he should, in our courts, and to the demand of one of our citizens, plead, as a protection against his engagements, the laws of a foreign country, of which the people of Louisiana had no knowledge; and would we tell them that ignorance of foreign laws, in relation to a contract made here, was to prevent them enforcing it, though the agreement

Eastern Dis't
*April, 1827.*

SAUL
*vs.*
HIS CREDI-
TORS.

was binding by those of their own state? Most assuredly, we would not. *4 Martin,* 193.

Take another case. By the laws of this country, slavery is permitted, and the rights of the master can be enforced. Suppose the individual subject to it is carried to England or Masssachusetts;—would their courts sustain the argument that his state or condition was fixed by the laws of his domicil of origin? We know, they would not.

These examples might be multiplied, but they are sufficient to explain the ideas of this court, that it is almost impossible to lay down any general rule on the subject; and that even the personal statutes of one country may be controled by those of another.

From the various definitions already cited, it may be easily supposed, that a vast diversity of opinion existed in their application to the contract of marriage. Both in France and Holland, it has been a subject of great contention. The courts and parliaments, of different provinces, deciding it differently. Some of them considering the law which regulates the rights of parties in the country where the marriage takes place as real: some as personal.

EasternDis'et
*Apr 1,*1827.

SAUL
vs.
HIS CREDI-
TORS.

An examination of the different treatises on this subject has convinced us, that the greater number of the lawyers of those countries, are of opinion, that in settling the rights of husband and wife, on the dissolution of the marriage, to the property acquired, the law of the place where it was contracted, and not that where it was dissolved, must be the guide. Such was the jurisprudence of the parliament of Paris. It was the opinion of *Dumoulin*, of *Boullenois*, of *Rodenburgh*, of *Le Brun*, of *Froland*, of *Bouhier*, of *Stockmans*, of *Pothier*, and it is that of *Merlin*. On the other side are found, *D'Argentre, Cravette, Everard, Vandermeulen*, the parliament of Rouen, the supreme court of Brabant, and that of Metz.

But it is evident, the opinions of the greater number of those who think that on the dissolution of the marriage, the law of the place where it was contracted should regulate the rights of the spouses to the property possessed by them, is founded on an idea which first originated with Dumoulin, that where the parties marry without an express contract, they must be presumed to contract in relation to the law of the country where the marriage

Eastern Dis't
April, 1827.

SAUL
vs.
HIS CREDI-
TORS.

took place, and that this tacit contract follows them wherever they go.

It is particularly worthy of remark, that Dumoulin, the founder of this system, was of opinion, that the statute regulating the community was real, and that it was to escape from the consequenჟes of this opinion he supposed a tacit contract, which, like an express one, followed the parties wherever they went. Such, at least, was the opinion which Boullenois entertained of Dumoulin's sentiments; and it appears supported by quotations which he makes from his works. *Boullenois, Traite de personalite et de realite des lois. Obs.* 29. p. 740, 757, 758.

Some of those who have adopted the conclusions of Dumoulin in regard to the marriage contract, treat the idea of a tacit agreement as one which exists in the imagination alone. But the greater number seem to have embraced it; and we are satisfied it is the main ground on which the doctrine now rests in France. So far, therefore, as great names can give weight to any opinion, it comes to us in a most imposing shape, but to our judgment it is quite unsatisfactory.

Eastern Dis't
*April*, 1827.

SAUL
*vs*
HIS CREDI-
TORS.

Admitting it for a moment to be true, that when parties married there was a tacit contract between them, their rights to property subsequently acquired, should be governed by the laws of the country where the marriage took place: that tacit agreement would still be controled by the positive laws of any country into which they might remove. This is admitted by *Dumoulin* himself, who, after treating of the tacit agreement, and stating that the statute is not legal but conventional, *Statutarium proprie non este nec legale, sed conventitium*, adds, such tacit convention cannot have this effect in another place, where there exists a contrary statute, which is absolute and prohibitive, *alias si statutum esset absolutum et prohibitorium, non obstantibus pactis factis in contrarium: tunc non haberet locum ultra fines sui territorii. Dumoulin on the first book of the Code, verbo conc. de stat. et consuet. loc. Froland, Memoires sur les statuts*, chap. 4, 63.

If such be the consequence where the statute is prohibitive, we do not see why the same result should not follow from a *real statute*, which regulates things within the limits of the country where it is in force. The reason

Eastern Dis'ct
*April,* 1827

SAUL
*vs.*
HIS CREDI-
TORS.

for both is the same, namely, that the laws of the country where the contract is sought to be enforced, are opposed to it. Why the one should have effect, and the other should not, we profess to be unable to distinguish. It may be a question whether the statute is real or not, but the moment it is admitted to be so, it regulates all property acquired within its authority; then, according to the principles of Dumoulin, the tacit agreement can no more control it, than it could the law which positively forbade such tacit agreement from having effect. So that even admitting this tacit agreement, we are brought back to the point from which we started; that is, whether the law regulating the right of husband and wife, be real, or personal?

But without agreeing with those, who have treated the idea of Dumoulin as one purely of the imagination, we think that he gives to this tacit consent a much more extended effect than it is entitled to. That in supposing when parties marry, they intend the laws of the place where the contract is made, should govern them wherever they go, *he begs the question;* and that the first thing to be settled is, whether these laws do govern them wherever they go.

EasternDis'ct
*April,* 182.7

SAUL
*vs.*
HIS CREDI-
TORS.

We are now treating, let it be remembered, of a case such as that before us, where there is no express contract, and the argument is, that the parties not having entered into an express agreement, the presumption must be, they intended their rights to property should be governed by the laws of the country where they married. This is admitted. But then this presumption, as to their agreement, cannot be extended so as to give a greater effect to those laws than they really had. If it be true those laws had no effect beyond the limits of the state where they were passed:— then it cannot be true to suppose, the parties intended they should have effect beyond them. The extent of the tacit agreement depends on the extent of the law. If it had no force beyond the jurisdiction of the power by which it was enacted; if it was real, and not personal, the tacit consent of the parties cannot turn it into a personal statute. They have not said so; and they are presumed to have contracted in relation to the law, such as it was *to have known its limitations, as well as its nature,* and to have had the one as much in view as the other. If the law of Virginia should have been, that for twenty years, the acquisitions made by the

EasternDis'et
*April*, 1827.

SAUL
*vs.*
HIS CREDI-
TORS.

parties belonged to one of them, and they married without an express stipulation to the contrary, they would be presumed to have contracted in reference to this *limitation of time*. If, on the contrary, the law is *limited as to place*, the tacit agreement which is founded on a supposed consent that the law should govern them, must be considered to have that limitation in view. In one word, the parties are presumed to have agreed, that the law should bind them as far as that law extended, but no further. So that this doctrine brings us back again to the enquiry, was the statute real or personal? Did it extend beyond the limits of the country where the marriage took place, or did it not?—Which ever it may be found to be, the parties must be supposed to have contracted. In the absence of any thing *expressed* to the contrary, we cannot *presume* they intended to enlarge or restrain the operation of the law.

The most familiar way of treating this idea, of tacit contracts, being made in relation to the laws of the country where they are entered into, is to say, that the agreement is to be construed the same way, as if those laws were inserted in the contract. Now, supposing parties to marry in Louisiana, and that our statute,

providing for the community of acquests and
gains, is real and not personal; that it divide
the property, acquired while in this state, equal
ly between the husband and wife, but does not
regulate that which they gain in another coun-
try to which they remove: the insertion of
this law in a contract, would be nothing more
than a declaration, that while residing *within
this state*, there should be a community of ac-
quests and gains. An agreement, such as this,
could not have the same force as an express
one, by which the parties declared, there
should be a community of acquests and gains,
*wherever they went:* for the one has no limi-
tation as to place, and the other has. The
maxim, therefore, which was so much pressed
on us in argument, *taciti et expressi eadem vis*,
is only true, where the law, to which the tacit
agreement refers, contains the same provisions
as the written contract.

It was evidently on this distinction the cases
of *Murphy* vs. *Murphy*,[1] and *Gales* vs. *Davis*[2]
*heirs*, were differently decided in this court.
In the former, there was an express contract,
that there should be a community of acquests
and gains between the parties, *even though
they should reside in countries where differ-*

[1] 5 Martin R. 83.
[2] 4 Martin R. 445.

ent laws might prevail.* In the latter, there was no express agreement; and the parties were not presumed to have made a tacit one, contrary to the law of the place where they married. They were not supposed to have agreed, that a real statute, which governed them only while there, was to follow them as a personal one, and regulate their property in another state. If principles so plain, required any authority, we would find it in the very author, on whom the appellants principally rely. Dumoulin, after stating that the tacit contract will be controlled by a law that is contrary to it, in the country where the marriage is dissolved, adds: that it will be different, where the agreement is express. *Nisi expresse de tali lucro conventium fuisset, quia pactio bene extenditur ubique, sed non statutum mere. Froland, Memoires sur les statuts, cap. 4, p. 63.*

Having thus stated the reasons why this doctrine of a tacit contract, cannot be admitted by us to the extent pressed by the counsel, it only remains for us to examine, whether the law of the *Fuero* was a real, or personal statute. We consider it real. It appears to us to relate to things, more than to persons; to have, in the language of D'Aguesseau, the destination

of property to certain persons, and its preser-

vation in families, in view. It gives to the wife and her heirs, the one half of that which would otherwise belong to the husband. Boullenois, who rejects Dumoulin's idea of a tacit agreement, says the statute which regulates the community is a personal one, because it fixes the state and condition of the spouses; and he goes so far as to declare, that if his adversaries will not allow this doctrine to be correct, then the statute is real, for on no other ground can it be considered personal. We think the state and condition of both husband and wife are fixed by the marriage, in relation to every thing but property, independent of this law; and as it regulates property alone, it is not a personal statute. *Boullenois, Traite des statuts, cap.* 5, *obs.* 29, *p.* 751; *cap.* 2, *obs.* 5, 80.

Upon reason, therefore, but still more clearly on authority, we think the appellants have failed to make out their case. We know of no question better settled in Spanish jurisprudence, and what is settled there, cannot be considered as unsettled here. The jurisprudence of Spain came to us with her laws. We have no more power to reject the one, than the other. The

EasternDis'ct
April, 1827

SAUL
vs.
HIS CREDI-
TORS.

people of Louisiana have the same right to have their cases decided by that jurisprudence, as the subjects of Spain have, except so far as the genius of our government, or our positive legislation, has changed it. How the question would be decided in that country, if an attempt were made there on the authority of French and Dutch courts, and lawyers, to make them abandon a road in which they have been travelling for nearly three hundred years, we need not say. The question is sufficiently answered by the *auto* already cited: in which the adoption of the opinions of foreign jurists, in opposition to those of Spain, is reprobated, and forbidden.

We conclude, therefore, that a community of acquests and gains did exist between the insolvent, and the mother of the appellees, from the time of their removal into this state; and that the court below committed no error, in placing them on the bilan as privileged creditors, for the amount of those acquests which remained in their father's possession, at the dissolution of the marriage.

The next claim which is contested, is that of Astor, who sets up a privilege on certain shares of bank stock, which he avers was pledged to him for the security of a loan of money.

The pleadings in this case need not be set out. The question presented by them is, whether the plaintiff has a right to be paid in preference to the other creditors, out of the proceeds of seven hundred and fifty-one shares of the capital stock of the bank of Orleans, pledged to him by an act passed before a notary public, in the city of New York, in security for the sum of sixty-four thousand dollars lent to the insolvent, and Benjamin Morgan.

The instrument of writing, on which this preference is claimed, was executed in New York, on the —— of November, 1822, and is in form a *sous seing prive.* To the execution of it there is one witness, George D. Cooper, who, we presume, is the same person who afterwards received an acknowledgment of it as notary public.

This acknowledgment is in the following words:—" State and city of New York, *ss.* on the twentieth day of November, 1822, before me George D. Cooper, notary public for the

SAUL
*vs*
HIS CREDI-
TORS.

city and state of New York, duly commissioned and sworn, dwelling in the city of New York, personally appeared Joseph Saul, and executed the within instrument of writing as his act and deed, and as the act and deed of the within named Benjamin Morgan, by virtue of a power of substitution from C. Price and Morgan, attornies in fact for the said Benjamin Morgan."

Our code provides, " That the property of the debtor is the common pledge of his creditors, and the proceeds of its sale must be distributed among them rateably, unless there exist among the creditors some lawful cause of preference."—*C. Code*, 468. *art.* 67.

" These lawful causes of preference result from privileges and mortgages."—*C. Code, ib·*

" Among the privileges on moveables, the debt on the pledge which is in the creditor's possession, is placed in the third rank."—*C. Code*, 469. *art.* 74, *No.* 3.

Our inquiry then is, has that "lawful cause of preference been established here ?"

The authority already quoted, has provided for the manner in which that arising from a pledge shall be created.

"The pledge is a contract by which a debtor

EasternDis'ct
*April.* 1827.

SAUL
*vs.*
HIS CREDI-
TORS.

gives something to his creditor, as a security for his debt."—*C. Code,* 446. *art.* 1.

"The power invests the creditor with the right of causing his debt to be satisfied out of the moveable thing which is given as a pledge, by privilege and preference to the other creditors."—*Ibid* 446. *art.* 5.

"This privilege shall take place against third persons only, in case the power is proved by an act made either in public form, or under private signature, provided that, in this last case, it should be duly registered in the office of a notary public, at a time not suspicious." *Ibid. art.* 6.

The privilege mentioned in the preceding article is established, with respect to incorporeal moveable things, as moveable credits, only by an authentic act, or by an act under private signature received as aforesaid, and notified to the debtor of the credits given in pledge."—*Ibid, art.* 7.

It is contended on the part of the appellees, that the *third persons*, mentioned in the provisions of our code, are not the chirography creditors of the insolvent.

The appellants urge, that by the French text of the law, all creditors are embraced.

The language used in it is, "*Ce privilege
n'aura lieu q'autant que le nantissement a
prouve, &c.* The expression, *third persons*,
not being contained in this enactment, they
contend any one may object to the want of
the formalities by which the privilege is esta-
blished.

At the period our late Civil Code was
adopted, the laws of this country were passed
in both the French and English languages,
and the act of the legislature which gave that
work the force of a law, directed, that in case
any obscurity or ambiguity should be found
in its provisions, the English and French
texts should be consulted, and mutually serve
to the interpretation of each other.—*Acts of
1808, cap. 29, sec. 5.*

In applying the rule of construction, here
established, to the cases contemplated by it,
this court has held, that whenever the expres-
sions used in the different texts, could be re-
conciled and made to harmonize each other,
it was our duty so to interpret them. But
that where they could not, such construction
should be adopted, as would give effect to
both.—*Vol. 2. N. S. 585.*

Thus in the case of *Touro* vs. *Cushing*,

Eas'rnDis'ct
*April*, 1827.

SAUL
vs.
HICREDI-
ORS.

where the texts presented two distinct ideas to the mind, we thought a compliance with either, sufficient on the part of him who claimed the benefit of the law; otherwise, as was there said, the statute would be a *decoy*, instead of a *beacon*. *Vol.* 1, 425.

And in that of *Chretien* vs. *Theard*, when the difficulty arose on an enactment which made *adonne au vol* in the French ext, a ground of *redhibition*, and in the English, restricted it to *robbery;* we held that i was our duty to take the language in its mot enlarged sense; because, in doing so, we ave full effect to both clauses. *Vol.* 2. 582.

So, here, if the expressions "shall take pice against third persons," used in the Engsh part of the law, limited the right of opposin to a particular class of creditors; the language in the French, which declared geerally, that it should not take place, (*n'auia lieu*) would control them; because, by this iterpretation we give effect to both.

But there is, in truth, no difference in the sense conveyed by the two texts. The words, *third persons*, in the English, must mean all the creditors, or they mean no person. In relation to a sale of immovable property, these

words have been construed to mean, those who had obtained a privilege or mortgage on it; but in respect to moveables given in pledge, a delivery is the very essence of the contract, and two persons cannot acquire a privilege on on them. If, therefore, chirograpory creditors could not object to the want of the formalities necessary to give a preference against third persons, the whole provision would be without effect

The appellants contend, that the instrument by which this pledge was created, is not an authentic act; that it has no more authenticity her than a *sous seing prive*, and that it was reorded at a suspicious time.

t becomes, therefore necessary to enquire what kind of act is meant by the code. In the sixth article of the title, in relation to pledge, (which has been already cited) it is required, that the pledge should be proved by an act *in public form*. This is rendered in the French text, by the words *acte authentique*. In the seventh, which relates to the species of pledge on which this contract has arisen, the English part of the law declares, it must be shown by an *authentic act*. This is given in the French. by the expression, *acte public*.

EasternDis'ct
*Apr 1*,1827.

SAUL
*vs.*
HIS CREDI-
TORS.

In regard to the alleged inconsistency, in the 6th article, it is a matter of inferior considera- tion, for the act there spoken of is in relation to pledges other than that now before the court, but we apprehend none such, really exists. The interpretation attempted to be given to the words, *in public form*, would introduce a kind of act unknown to our law, which requires but two; those which make proof by themselves, and those which do not: The former are called *authentic*—the latter, *sous seing prive.* If every act to which a public form was given, became authentic, without witnesses, and with- out the signature of a public officer, then there would, in reality be no difference between such an instrument, and one under private signa- ture; and the law would be made to mean nothing, when it directs, that pledges shall be evidenced by an act *either* in public form, *or* by private signature, *duly registred.*

This enquiry is, however, of inferior impor- tance; because the article of the code in rela- tion to pledges of incorporeal things, directs, that they must be proved by a public act; and what such act is the code itself defines. *C. code*, 304, 217.

But it is said the French text, uses the words

*public act.* Now, we understand this to be the same thing as *authentic act.* The latter, according to the article in the code first cited, is that "which has been recorded by public officers, having power to record public acts in the place where the act has been drawn up, and with the requisite solemnities." When we enquire from the same authority, for the definition of a *public act*, we do not find any given of it. We are therefore forced to have recourse to the laws that governed us previous to the passage of that work; and the definition given by them, is precisely that of an authentic act in our own legislation: *Per instrumento publico, se entiende el que esta hecho por persona en quien reside antoridad publica, con todas las solennidades prescriptas por derecho, para su validacion y firmeza. Febrero, p.* 2, *Lib.* 3, *cap.* 1 § 7 *no.* 352.

The appelants contend, this is not a public act, because notaries public in New York, have no authority by the laws of that state, to pass or record contracts such as that presented by the plaintiff. To this objection, we think the appellee has conclusively answered, that as the laws of that state have not been produced or shewn to this court, we must presume in this

EasternDis'et
*April*, 1827.

SAUL
*vs.*
HIS CREDI-
TORS.

case, as we have done in several others, that they are similar to our own; and that, consequently, the act was executed before an officer duly authorised to receive it, because such officers have authority to do so in Louisiana.

But this argument returns with fatal effect upon the appellee, when we proceed to examine the act produced; for we cannot refuse to the appellants the same presumption of similarity of laws which we extend to their adversary. The instrument by which the pledge is evidenced, would not be an authentic act in our state. It would be nothing more than one *sous seing prive*—by private signature: for it wants the number of witnesses essential to the former by our law. It is difficult, indeed, to say what it was intended to be when first made. It has the form of a private act; is without date, and is signed by the parties, and the notary *as a witness.* Afterwards, this notary, who was sole witness, declares that the parties appeared before him in his official capacity, and executed it; and he signs this declaration without any witnesses.

Such an instrument, if executed within this state, would neither be an authentic, or public

Eastern Dis't
*April*, 1827.

SAUL
*vs.*
HIS CREDI-
TORS.

act; nor could it be considered as duly recorded. Two witnesss are indispensable; and the instrument must either be duly recorded, or be an authentic act, to enable the party claiming under it to obtain a preference. The commands of the legislature on this head, are not only positive, but prohibitive. They take away all discretion from the court. It is *only* when one or other of these exist, that a preference is created by the pledge of incorporeal things.

It was, most probably, from a conviction of the law being so, that the appellee caused the instrument to be recorded in this state. This recording was made in due form; but the appellants insist it was not made at a proper time.

Our code, after declaring that acts under private signature, duly registered, are sufficient to establish a preference on the thing pledged, adds, as a condition; provided this recording is made at a period *not suspicious.*

We are now called on, for the first time, to affix a meaning to these words, *not suspicious;* and some little difficulty is created by the indefinite terms in which the prohibition is couched. It was clearly, however, the inten-

EasternDis't
April, 1827.
SAUL
vs.
HIS CREDI-
TORS.

tion of the legislature, to indicate some period after which the instrument could not be registered; and it is equally clear, the interests of the parties to the contract were not the cause of this enactment. The expressions, therefore, must be construed in relation to those, whom it was evidently the intention of the law to protect; persons who might have an interest in preventing privileges or preferences being obtained on the es-tate of their debtor.

As, therefore, the object of the law was to prevent those, who had not previous to the time prohibited, obtained a privilege, from obtaining one by their own act, we know of no other rule to adopt than this:—that, at whatever period the debtor could not give a preference o any of his creditors by an act of his, the creditor cannot, in relation to this contract, acquire one by having an instrument which gave him none, recorded. We must either adopt this conclusion, or say the law has no meaning whatever; which would be contrary to every rule that governs courts in the interpretation of statutes: it being their duty, if possible, to give the statute effect, and not to consider it made for no purpose. The meaning attached by the appellee to these expressions, would

SAUL
*vs.*
HIS CREDI-
TORS.

enable the creditor to enregister his act, one hour before the insolvent filed his bilan; but this, we are satisfied, would be defeating the clear and evident intention of the legislature, and render the enactment useless. *Lex neminem cogit ad vana.*

Applying these principles to this case, we think the recording was made, to use the language of our law, *at a suspicious time.* It was enregistered on the 31st January, 1826, in a notary's office in this city. It makes a part of the admissions of the parties on record, that nearly two months previous to this recording, the insolvent had made application to the banks for time to pay his debts; declaring his inability to comply with his engagements—that the request had been refused—that suits had been commenced against him before the act had been enregistered; and that, he shortly after claimed the benefit of a *cessio bonorum.*

Repeated decisions of this court, founded on the laws of Spain, have settled, that a preference cannot be given by a debtor to one of his creditors, in what is called *tiempo inhabil.* That, where there exists an inability to pay debts, and a cession of property follows soon after, the debtor cannot make any change in

the rights of his creditors; that, *actual* is the same as *declared* insolvency. In this case, we are satisfied that at the time the act was recorded, Saul could not have given a preference to any of the persons to whom he was indebted; and we conclude, the creditor could not acquire one by his own act. 3 *Martin*, 270. 4 *ibid*, 238. 2 *n. s.* 61.

It was urged on the court, that there was an acknowledgment on record, that the instrument was executed in New York; and that this must be understood to mean the act was executed according to the laws of New York. But we are clearly of opinion, that no such inference can be made from this fact. The admission of the execution of an act, in our understanding, means nothing more than that the instrument was signed according to its purport, and dispenses with any proof. But it proves nothing more. There are many acts made and executed contrary to law in every country. It is also plain to us, that the admission was not contemplated to have this effect at the time it was made. If such had been the meaning of the parties, it was unnecessary for the appellee to have followed it up in the statement, by obtaining another admission from the

Eastern Dis't
*April,* 1827.

A UL
*vs.*
HIS CREDI-
TORS.

appellants—that Cooper who signed it, was a notary public in the state of New York, and that the attorney in fact who executed it, was duly authorised so to do.

It was also contended, that this case came within the principle on which this court has decided, that an act of sale of immoveable property *sous seing prive*, followed by delivery, was good against creditors, unless they were injured by it. But the cases are quite dissimilar. In respect to the latter, our code declares that the sale by private signature, passes the property to the buyer. It does not, of course, make a part of that which is transferred by the insolvent debtor to his creditors. When they came forward, therefore, to take it from the purchaser, they came to assert a right given by positive law alone; and it was held that our legislation did not authorise this claim, unless they had been injured by the transaction. But in this case, no ground can be found on which the court could take that position. The contract of the pledge did not transfer the property. It passed by the cession from the debtor to his creditors, and made a part of the effects surrendered to them; and it is the appellee who claims a preference on it.

EasternDis'ct
*April*, 1827.

SAUL
*vs.*
HIS CREDI-
TORS.

The appellants meet this, by presenting against the demand, a textual provision of our law which declares, that the property of the debtor is the common fund of his creditors, and that it must be divided rateably, unless there exists among them some *lawful cause* of preference. They shew another, which declares that this *lawful cause* of preference on a pledge, must be established by an authentic act—or one under signature, duly registered at a time not suspicious. This act, for the reason given, is neither authentic, nor one *sous seing prive* duly recorded. Our judgment, therefore, must repeat the language of the law, and direct the property to be divided rateably among the creditors.

The third case, that of Brown and Son, comes entirely within the principles of law just applied to that of Astor, and must receive a similar judgment.

It is therefore ordered, adjudged and decreed, that the judgment of the district court so far as it respects the claim of the children of Joseph Saul the insolvent, be affirmed with costs; and so far as the same confers a privilege on J. J. Astor, and A. Brown and Son,

SAUL
*vs*
HIS CREDI-
TORS.

and directs them to be paid out of the proceeds of bank stock to them pledged, that it be annulled, avoided and reversed: and that they pay costs in this court.

*Grymes & Hennen* for Astor, *Mazureau & Rawle,* for Saul and al., *Morse* for Brown, *Eustis & Livermore* for the appellants.